CASE NO. 25-60196

# In the United States Court of Appeals
# For the Fifth Circuit

PHIL BRYANT; DEBORAH BRYANT,
*Plaintiffs-Appellants*,

*v.*

MICHAEL ROSENBERG; THE ARENA GROUP HOLDINGS, INC.,
*Defendants-Appellees*

On Appeal from the United States District Court
for the Southern District of Mississippi, Northern Division,
Civil Action No. 3:24-cv-00260-KHJ-MTP

## BRIEF OF APPELLANTS

Respectfully submitted:

William M. Quin II (MS Bar No. 10834)
W. Thomas McCraney, III (MS Bar No. 10171)
**MᴄCʀᴀɴᴇʏ Mᴏɴᴛᴀɢɴᴇᴛ Qᴜɪɴ & Nᴏʙʟᴇ, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:  601-707-5725
Facsimile:   601-510-2939
Emails:      wquin@mmqnlaw.com; tmccraney@mmqnlaw.com

**Attorneys for Plaintiffs-Appellants, former
Mississippi Governor Phil Bryant and his wife,
former First Lady Deborah Bryant**

CERTIFICATE OF INTERESTED PERSONS
CASE NO. 25-60196

I.     No. 25-60196, *Phil Bryant & Deborah Bryant v. Michael Rosenberg & The Arena Group Holdings, Inc.*, USDC No. 3:24-CV-260 (S.D. Miss.)

II.     Plaintiffs-Appellants certify that the following listed persons and entities, as described in the fourth sentence of Rule 28.2.1, have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal:

1)     **Plaintiffs-Appellants:**

Phil Bryant; Deborah Bryant

2)     **Defendants-Appellees:**

Michael Rosenberg; The Arena Group Holdings, Inc.

3)     **Attorneys of Record for the Bryants:**

William M. Quin II
W. Thomas McCraney, III
McCraney Montagnet Quin & Noble, PLLC
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 707-5725

4)     **Attorney of Record for Michael Rosenberg:**

Sidney R. Hill, III
McAngus Goudelock & Courie, LLC – Oxford
119 North 9th St.
Oxford, Mississippi 38655
Telephone: (662) 281-7871

5)    **Attorneys of Record for The Arena Group Holdings, Inc.:**

Susan E. England
Faegre Drinker Biddle & Reath, LLP
2323 Ross Avenue, Suite 1700
Dallas, Texas 75201
Telephone: (469) 327-0860

Katlyn M. Moseley
Faegre Drinker Biddle & Reath, LLP – Washington
1500 K Street, NW
Washington, D.C. 20005
Telephone: (202) 230-5346

Paul A. Rosenthal
Faegre Drinker Biddle & Reath, LLP – Florham Park
600 Campus Drive
Florham Park, New Jersey 07932
Telephone: (973) 549-7030

Respectfully submitted:

By:    /s/ *William M. Quin II*

William M. Quin II (MS Bar No. 10834)
W. Thomas McCraney, III (MS Bar No. 10171)
**MCCRANEY MONTAGNET QUIN & NOBLE, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:  (601) 707-5725
Facsimile:  (601) 510-2939
Email:      wquin@mmqnlaw.com
            tmccraney@mmqnlaw.com

**Attorneys for Plaintiffs-Appellants, former
Mississippi Governor Phil Bryant and his wife,
former First Lady Deborah Bryant**

## STATEMENT REGARDING ORAL ARGUMENT

The facts supporting the actual malice element of Plaintiffs-Appellants' defamation and false light claims are found in the complaint, its exhibits, and the public records before the district court when it considered the Fed. R. Civ. P. 12(b)(6) motions. Plaintiffs-Appellants respectfully suggest that this Court would benefit from hearing counsel discuss the facts that render the actual malice allegations plausible. Further, if the Court believes the complaint should have been pleaded with greater specificity, it would benefit from hearing counsel discuss the equities that weigh in favor of allowing the Plaintiff-Appellants to amend the complaint.

# TABLE OF CONTENTS

Certificate of Interested Persons ............................................................... ii

Statement Regarding Oral Argument ....................................................... iv

Table of Contents ........................................................................................ v

Table of Authorities ................................................................................ viii

Jurisdictional Statement ............................................................................. 1

Statement of the Issues ............................................................................... 1

Statement of the Case ................................................................................. 2

    A. Procedural Background ....................................................................... 2

    B. Factual Background ............................................................................. 3

        1. The Article ..................................................................................... 3

            a. The Article accuses Bryant of misspending millions of welfare dollars on the construction of the USM Volleyball Facility to please Favre ......................................................... 4

            b. The Article accuses Bryant of agreeing to misspend millions of welfare dollars on Prevacus in exchange for company stock .......... 11

        2. The Complaint ............................................................................. 12

            a. The evidence does not prove that Bryant misdirected welfare funds to the USM volleyball facility project ................................. 13

            b. The evidence does not prove that Bryant misdirected welfare funds to Prevacus or that he agreed to accept company stock ....................... 18

            c. Neither White nor independent auditors hired by MDHS determined that Bryant misspent welfare funds ................................. 22

      d. MDHS did not sue Bryant .................................................25

      e. Criminal authorities did not prosecute Bryant .....................26

Summary of the Argument.........................................................27

Argument.....................................................................................28

  A. Standard of Review...............................................................28

  B. Bryant plausibly pleaded actual malice ...............................30

    1. The defendants rejected innocent interpretations of the evidence in favor of the most damaging interpretations ..........................................31

    2. The Article makes sensational and inherently implausible accusations ................................................40

    3. The defendants knew they would harm Bryant........................................42

    4. The defendants disregarded White's statements .....................................43

    5. The defendants disregarded the firsthand accounts of Bryant, VanLandingham, and Freeze........................................44

    6. There are obvious reasons to doubt the information supplied by Carol Burnett and John Davis................................................45

      a. Carol Burnett ................................................46

      b. John Davis ................................................48

    7. The defendants failed to conduct an adequate investigation...................49

    8. The defendants deliberately distorted facts ............................................51

    9. The defendants had a preconceived storyline ..........................................53

    10. The defendants refused to retract their accusations .................................54

C. The Bryants should be granted leave to amend their complaint......................56

Conclusion .................................................................................................59

Signature of Counsel ...................................................................................59

Certificate of Service ..................................................................................60

Certificate of Compliance ...........................................................................61

# TABLE OF AUTHORITIES

## Case Law

*Phil Bryant, et al. v. Deep South Today d/b/a Mississippi Today, et al.*,
No. 23-cv-238-JM (Madison Cty., Miss. Cir. Ct.) ....................................................2

*Middaugh v. InterBank*,
528 F. Supp. 3d 509 (N.D. Tex. 2021) ......................................................................2

*Favre v. Sharpe*,
117 F.4th 342 (5th Cir. 2024) ...................................................................................3

*Mississippi Department of Human Services v. Mississippi Community Education Center, Inc., et al.*,
No. 25CI1:22-cv-286-EFP (Hinds Cty., Miss. Cir. Ct.)..........................................25

*U.S. v. Davis*,
No. 3:22-cr-104-CWR-LGI (S.D. Miss.)..................................................................26

*U.S. v. Ely*,
140 F.3d 1089 (5th Cir. 1998)..................................................................................27

*U.S. v. Shoemaker*,
No. 2:11-cr-38-NBB-DAS, 2012 WL 313620 (N.D. Miss. Feb. 1, 2012).............27

*U.S. v. Heard*,
709 F.3d 413 (5th Cir. 2013)....................................................................................27

*Santander v. Salazar*,
133 F.4th 471 (5th Cir. 2025) ............................................................................ 28-29

*Ferguson v. Bank of New York Mellon Corp.*,
802 F.3d 777 (5th Cir. 2015)....................................................................................28

*Ashcroft v. Iqbal*,
566 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)..........................................28

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)..................................... 28-29

*Pena v. City of Rio Grande City,*
879 F.3d 613 (5th Cir. 2018) ...................................................................29

*Walker v. Beaumont Independent School District,*
938 F.3d 724 (5th Cir. 2019) ...................................................................29

*Lewis v. Fresne,*
252 F.3d 352 (5th Cir. 2001) ...................................................................29

*Hodge v. Engleman,*
90 F.4th 840 (5th Cir. 2024) ...................................................................29

*Rebozo v. Washington Post Co.,*
637 F.2d 375 (5th Cir. 1981), *cert. denied*, 454 U.S. 964,
102 S.Ct. 504, 70 L.Ed.2d 379 (1981) ...............................30, 33-35, 37-39

*New York Times v. Sullivan,*
376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) ...................30, 32, 35

*Curtis Publishing Co. v. Butts,*
388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ...............30, 42, 49

*Hunt v. Liberty Lobby,*
720 F.2d 631 (11th Cir. 1983) ...................................................................30

*Herbert v. Lando,*
441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) ...............................30

*US Dominion v. Byrne,*
600 F. Supp. 3d 24 (D. D.C. 2022) ...........................................................30

*Hutchinson v. Proxmire,*
443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) ...............................30

*Palin v. New York Times Company,*
940 F.3d 804 (2nd Cir. 2019) ........................................................ 30-31, 53

*Time v. Pape,*
401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971) ...................31-33, 36-37

ix

*Bose Corp. v. Consumers Union of U.S., Inc.*,
466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984).............................................32

*Levine v. CMP Publications, Inc.*,
738 F.2d 660 (5th Cir. 1984)....................................................................................32

*St. Amant v. Thompson*,
390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)................................. 34-35, 41

*Time, Inc. v. Ragano*,
427 F.2d 219 (5th Cir. 1970).....................................................................................35

*Warford v. Lexington Herald-Leader Co.*,
789 S.W.2d 758 (Ky. 1990) .....................................................................................35

*Tavoulareas v. Piro*,
759 F.2d 90 (D.C. Cir. 1985).............................................................................. 35-38

*Tavoulareas v. Washington Post Co.*,
567 F. Supp. 651 (D. D.C. 1983) .............................................................................35

*Tavoulareas v. Piro*,
763 F.2d 1472 (D.C. Cir. 1985)................................................................................38

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 870,
108 S.Ct. 200, 98 L.Ed.2d 151 (1988)................................................................ 38-39

*Cannaughton v. Harte-Hanks Commc'ns, Inc.*,
842 F.2d 825 (6th Cir. 1988)....................................................................................39

*Blanke v. Time, Inc.*,
308 F. Supp. 378 (E.D. La. 1970).............................................................................40

*Alioto v. Cowles Communications, Inc.*,
519 F.2d 777 (9th Cir. 1975).....................................................................................40

*US Dominion v. Powell*,
554 F. Supp. 3d 42 (D. D.C. 2021)..................................................................... 41-42

*Batson v. Time, Inc.*,
298 So. 2d 100 (La. Ct. App. 1st Cir. 1974)............................................................43

*Young v. Gannett Satellite Information Network*,
734 F.3d 544 (6th Cir. 2013).................................................................... 43-44

*Nader v. de Toledano*,
408 A.2d 31 (D.C. App. 1979), *cert. denied*, 444 U.S. 1078,
100 S.Ct. 1028, 62 L.Ed.2d 761 (1980)....................................................44

*Cape Publications, Inc. v. Adams*,
336 So. 2d 1197 (Fla. Ct. App. 1976)................................................. 44-45

*Harte-Hanks Commc'ns v. Connaughton*,
491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989)............................45, 48, 51

*Prozeralik v. Capital Cities Communications, Inc.*,
626 N.E.2d 34 (N.Y. Ct. App. 1993) .......................................................46

*Reid v. Viacom International Inc.*,
No. 1:14-CV-1252-MHC, 2017 WL 11634619 (N.D. Ga. Sept. 22, 2017) ...........48

*Bartimo v. Horsemen's Benev. and Protective Ass'n*,
771 F.2d 894 (5th Cir. 1985)...................................................................49

*Vandenburg v. Newsweek, Inc.*,
441 F.2d 378 (5th Cir. 1971)...................................................................49

*Palmtag v. Republican Party of Nebraska*,
999 N.W.2d 573 (Neb. 2024)...................................................................51

*Westmoreland v. CBS*,
596 F. Supp. 1170 (S.D. N.Y. 1984) ................................................... 51-52

*Schiavone Constr. Co. v. Time, Inc.*,
847 F.2d 1069 (3rd Cir. 1988) .................................................................52

*Crane v. Arizona Republic*,
972 F.2d 1511 (9th Cir. 1992)...................................................................52

*Castellani v. Scranton Times, L.P.*,
124 A.3d 1229 (Pa. 2015) ................................................................. 53-54

*Sisemore v. U.S. News & World Report, Inc.*,
662 F. Supp. 1529 (D. Alaska 1987) ........................................................54

*Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*,
708 F.2d 944 (5th Cir. 1983).............................................................. 54-56

*National Ass'n of Government Employees, Inc. v. National Fed'n of Federal
Employees*,
844 F.2d 216 (5th Cir. 1988)....................................................................56

*Deep South Communications, LLC v. Fellegy*,
652 F. Supp. 3d 636 (M.D. La. 2023)..................................................... 56-57

*Byrd v. Bates*,
220 F.2d 480 (5th Cir. 1955) ...................................................................56

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002).............................................................. 56-57

*MedARC, LLC v. Cigna Behavioral Health of Texas*,
No. 3:20-CV-N-BH, 2021 WL 3476810 (N.D. Tex. July 6, 2021).........................57

*In re Life Partners Holdings, Inc.*,
926 F.3d 103 (5th Cir. 2019)............................................................... 57-58

## Federal Statutes & Rules

Fed. R. Civ. P. 10(c)..............................................................................2

18 U.S.C. § 371 .....................................................................................26

18 U.S.C. § 666(a)(1)(A) ........................................................................26

18 U.S.C. § 3282 ............................................................................... 26-27

Fed. R. Civ. P. 12(b)(6)...........................................................................28

## **Legal Treatises**

R. Sack, *Libel, Slander, and Related Problems* 214 (1980) .............................. 35-36

E. Cleary, *McCormick's Handbook on the Law of Evidence* § 185
(2d ed. 1972) .........................................................................................37

Rodney A. Smolla, 1 Law of Defamation § 3:71,
*Actual Malice and the Reporting and Editing Process –*
*Preconceived Story Lines* (2nd ed. May 2025 Update)..............................................53

5B Charles Alan Wright & Arthur R. Miller,
*Federal Practice and Procedure* § 1357 (3rd ed. 2016)...........................................57

Judy M. Cornett, *Pleading Actual Malice in Defamation Actions*
*after Twiqbal: A Circuit Survey*, 17 Nev. L.J. 709 (2017) .....................................58

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1332(a) because this action involves a controversy between parties of diverse citizenship and the amount in controversy exceeds $75,000.00.[1] This Court has jurisdiction under 29 U.S.C. § 1291 because Governor Bryant and his wife, Deborah, are appealing a final judgment entered on March 25, 2025.[2] This appeal is timely because the Bryants filed their notice of appeal on April 8, 2025,[3] within the thirty days allowed by Fed. R. App. P. 4(a)(1)(A), and the Appellants' brief and record excerpts were due on or before July 11, 2025.[4]

## STATEMENT OF THE ISSUES

1.    Did the district court err when it determined former Governor Bryant did not adequately plead actual malice?

2.    Did the district court err when it refused to grant the Bryants leave to amend?

---

[1] ROA.8; ROA.12.

[2] ROA.971.

[3] ROA.972-973.

[4] Memorandum to Counsel [ECF Doc. 29].

## STATEMENT OF THE CASE

### A. Procedural Background

The Bryants filed this action on May 9, 2024,[5] against Michael Rosenberg and The Arena Group Holdings, Inc. ("Arena"), the publisher of *Sports Illustrated*. They attached the following exhibits to their complaint: (1) an article by Rosenberg entitled *"The Driving Force": How Brett Favre's Demands for Cash Fueled a Scandal* (the "Article");[6] (2) the Second Amended Complaint ("SAC") in *Phil Bryant, et al. v. Deep South Today d/b/a Mississippi Today, et al.*, No. 23-cv-238-JM (Madison Co., Miss. Cir. Ct.);[7] (3) demands for retractions, corrections, and apologies under Miss. Code Ann. §95-1-5(1);[8] and (4) a pair of responses to those demands.[9] These documents are incorporated in the complaint as a matter of law. *Middaugh v. InterBank*, 528 F. Supp. 3d 509, 536-37 (N.D. Tex. 2021); Fed. R. Civ. P. 10(c).

---

[5] ROA.6-30.

[6] ROA.31-77.

[7] ROA.78-281.

[8] ROA.282-297; ROA.299-306.

[9] ROA.298; ROA.307.

Arena moved to dismiss on July 15, 2024.[10] Rosenberg filed a motion to dismiss seven days later.[11] The Bryants responded on July 23, 2024.[12] Arena and Rosenberg replied.[13] The district court subsequently ordered the parties to address the applicability of *Favre v. Sharpe*, 117 F.4th 342 (5th Cir. 2024).[14] The parties complied.[15] On March 25, 2025, the district court granted the motions, denied leave to amend the complaint, and entered its final judgment.[16]

## B. Factual Background

### 1. The Article

The Article's theme is that Governor Bryant, Mississippi Department of Human Services ("MDHS") Executive Director John Davis, Mississippi Community Education Center ("MCEC") Director Nancy New, and NFL Hall of Fame and former University of Southern Mississippi ("USM") quarterback Brett Favre conspired to misspend millions of welfare dollars in the construction of a volleyball facility on USM's campus and investing in Prevacus, a pharmaceutical company

---

[10] ROA.311-346.

[11] ROA.365-375.

[12] ROA.378-885.

[13] ROA.889-915.

[14] ROA.928.

[15] ROA.929-948.

[16] ROA.949-971.

promoted by Favre;[17] that Davis and New have faced criminal charges for their roles in the scheme, and MDHS has sued Davis, New, and Favre to recoup misspent funds; and that Bryant manipulated people and events to conceal his involvement and has thus far escaped criminal charges and civil suit. The Article speculates that federal prosecutors may be "weighing the chances of convicting a local hero vs. the optics of not charging one and whether they would need Favre's help to get Bryant."[18]

### a. The Article accuses Bryant of misspending millions of welfare dollars on the construction of the USM Volleyball Facility to please Favre.

On July 24, 2017, Davis, New, Favre, and others met to discuss the construction of a new volleyball facility for USM. During the meeting, Davis promised to contribute $4 million of welfare funds to the project.[19] Suggesting Bryant directed the scheme, the Article explains:

> Bryant's lawyers would later say he had "no knowledge of or involvement in" the meeting or the $4 million commitment. But Mississippi Low-Income Child Care Initiative founder Carol Burnett, who worked in MDHS in the early 2000s, tells SI, "***The head of DHS doesn't make those decisions without the governor's knowledge and approval. That is just unfathomable to me***."[20]

---

[17] The Article explains, "New was mostly following orders from Davis, the welfare chief. Davis largely operated on behalf of Mississippi's then governor, Republican Phil Bryant. And Bryant worked relentlessly to please the state's most famous athlete, NFL legend Brett Favre." *See* ROA.32.

[18] ROA.72.

[19] ROA.39-40.

[20] ROA.40 (emphasis added).

Nearly two years later, Favre asked New to pay $1.8 million in additional costs. New responded: "In a meeting with John Davis now. He said we will cover much of it but [it] may have to be in a couple of payments. We are on board!" The Article implies Bryant told Davis to make the $1.8 million payment, explaining that "[t]he ***volleyball scheme*** was almost complete. But there was about to be a break in the ***Bryant-to-Davis-to-New-to-Favre chain***."[21]

On June 21, 2019, MDHS Deputy Administrator Jacob Black notified Bryant that a paycheck written to MDHS employee Brett DiBiase was sent to a post office box belonging to Davis.[22] Bryant provided this information to State Auditor Shad White,[23] who commenced an investigation that would ultimately broaden into a large-scale examination of welfare misspending. MDHS announced Davis's retirement on July 8, 2019.[24] According to the Article, Davis's departure left "***the scheme***" with "three principals: Phil Bryant, the veteran pol. Brett Favre, the relentless competitor. Nancy New, the naïve pleaser."[25]

---

[21] ROA.53 (emphasis added).

[22] "There is zero public forensic evidence that Phil Bryant knew anything about the scheme between Davis, New, and [Christi Webb, director of another MDHS contractor] prior to June 21, 2019, when he was alerted by Jacob Black, a then-MDHS Deputy Director who has since been added to MDHS's lawsuit as a defendant." *See* the article cited on ROA.206 n. 93, https://magnoliatribune.com/2023/05/07/tanf-welfare-scandal-guilt-by-innuendo/.

[23] ROA.53.

[24] ROA.54.

[25] ROA.55 (emphasis added).

Bryant appointed retired FBI agent Chris Freeze to replace Davis and "[a]lmost immediately," he asked a staff attorney to find out from New "what the contract with Southern Miss is all about. Brett is asking for info on the proposed funding." According to the Article, Bryant's text was a ruse to make "*him seem only vaguely aware of the volleyball project*."[26]

On July 22, 2019, Favre asked Bryant for "government money" to construct an indoor practice facility ("IPF") for USM. Favre hoped an IPF might lure Shadeur Sanders, the son of NFL Hall of Fame football player Deion Sanders, to play football for USM. The Article explains:

> Bryant knew a legal land mine when he saw one. *His response read like it could have been written by – or for – a lawyer*.
>
> "The State Auditor is reviewing all the Contracts at DHS which Funds Families First. Hope we get legal clearance soon. Don't want to get anyone in trouble for improper expenditures. Should know soon."
>
> Favre kept pushing: "As far as families first and facilities goes I think we can do so much together. It would be beneficial for both."
>
> Bryant, formally again: "Hope we get clearance."
>
> Favre, pushing again: "What's your gut tell you will happen? I have to come up with a lot of money if this doesn't get clearance."
>
> Bryant, formally again: "It's the State Auditor that will give the approval. Has to have legal authority. I will check today."
>
> Favre, pushing *again*: "if I need to anything to help make this all work please let me know."

---

[26] ROA.57 (emphasis added).

Bryant: "Will do… we are checking today. Thanks for caring."[27]

Six days later, Favre again texted Bryant about an IPF. Bryant "responded with a text only a lawyer could love:"[28]

Nancy has some limited control over Federal Funds in the form of Grants for Children and adults in the Low Income Community. Use of these funds are tightly controlled. Any improper use could result in violation of Federal Law. Auditors are currently reviewing the use of these funds by Families First. As soon as the Audit is completed we will know if the project at USM is a proper expenditure. Neither I nor Nancy can make this decision. She must have approval from DHS and the State Auditor. As soon as we get approval we can move forward. Without that approval any expenditure could be illegal and Nancy and USM could be made to repay the Federal Government any and all funds spent. That's why we are waiting till it is approved.[29]

According to the Article, "Favre got the text but missed the message." Favre told Bryant that the volleyball facility was nearly constructed and asked Bryant to help him cover "the remaining 1,048,000" owed on the facility. Bryant responded: "I got called into this game late. […] Not sure who made the deal for a million dollars."[30]

---

[27] ROA.58 (bold and italics added; plain italics in original).

[28] *Id.*

[29] ROA.59.

[30] *Id.*

The Article claims Bryant "walked a thin line" with Chris Freeze – "distancing himself from the volleyball project while nudging it forward."[31] On August 21, 2019, Bryant texted Freeze:

> Brett Farve [*sic*] is blowing me up over that proposal Nancy New submitted for the Center at Southern Miss. I have told him it would be reviewed just like all other proposed projects. Brett needs more to do in his life just now. I really do think he believes in the project.

According to the Article, "Chris Freeze was no John Davis. In his texts, Freeze seems fond of the governor but willing to question him."[32] Freeze responded:

> Yes, Nancy is blowing me up, too. Unless there is additional information you would like MDHS to consider, I'm not inclined to approve at this time. I don't think now is the time to give them $2 million. We have reviewed and think there might be other ways to accomplish their goals than by creating a center at USM. Brett could be a part of those if he wanted. If you would like to talk so I can further explain, I would be happy to call at your convenience sir.[33]

Bryant replied an hour and a half later, and used his "text to check all the boxes he needed to fill – ***for whoever might be reading***." The Article casts Bryant as a masterful manipulator of people and events:

> Bryant portrayed himself as forthright and proper: "As always I am not going to interfere."
>
> … as being too busy to monitor MDHS funding: "You got a better understanding than I do of these projects."

---

[31] ROA.63.

[32] *Id.*

[33] *Id.*

… and as out of the loop for years: "I think Brett was told it was going to get done by the previous Director. One of the reasons that he is a former Director."

Bryant apparently wanted Freeze – *or whoever might be reading his texts* – to believe he had fired Davis, at least in part, for promising to fund the volleyball facilities. ***But Bryant had repeatedly made the same assurance to Favre for years – and he kept doing it***.[34]

Bryant, New, Favre, and Freeze met on September 4, 2019. Bryant reminded Favre after the meeting that "we have to follow the law." "But two days later, Bryant sent a text to a staff attorney."[35] The Article next describes Bryant in Machiavellian fashion, suggesting he used privileged communications to portray himself as innocent when, in fact, he had already secretly directed millions to the volleyball project:

"She wants to meet again," Bryant said of New. "Don't think that's a good idea. Keep this response as a record."

The reply: "Yes sir. She's relentless."

Bryant: "Nancy is worrying. She know[s] what they were doing was wrong."

The reply: "100%. She should be worried."

Bryant replied with a thumbs-up.

***The trap had been set. If the volleyball scheme were to blow up – which it would a few months later – Bryant had made it look like New was the perpetrator, Favre the accomplice, and Bryant the honest occasional advisor***.[36]

---

[34] ROA.63-64 (emphasis added).

[35] ROA.64.

[36] ROA.64-65 (emphasis added).

After Bryant left office, he texted USM President Rodney Bennett. The Article describes their communication as Bryant "selling" Favre "out." Bennett told Bryant that he had "asked Brett to not do the things he's doing to seek funding from state agencies and the legislature for the volleyball facility," explaining that Favre's requests fall outside Institutions of Higher Learning ("IHL") guidelines. Bennett concluded: "The bottom line is he personally guaranteed the project, and on his word and handshake we proceeded. It's time for him to pay up – it really is that simple." Bryant agreed: "Maybe he wants the State to pay off his promises. Like all of us I like Brett. He is a legend but he has to understand what a pledge means. I have tried many times to explain that to him."[37]

On February 6, 2020, Favre asked Bryant if he had spoken with newly elected Governor Tate Reeves about the volleyball facility project.  Bryant texted back with a link to a news report that explained White had arrested Davis, New, and others for welfare fraud. "'This has been the problem,' Bryant wrote. 'Not sure what funding will be available in the future.' Favre told Bryant he was 'well aware of it.' But he was still hoping for a 'bond bill' to finish paying for the volleyball facility."[38]

---

[37] ROA.69.

[38] ROA.69-70.

### b. The Article accuses Bryant of agreeing to misspend millions of welfare dollars on Prevacus in exchange for company stock.

The Article introduces Bryant's involvement with Prevacus as legally suspect, explaining that "Favre would soon push Bryant for a ***large, legally dubious*** [favor] – and he didn't have to push very hard." The Article continues:

> It had nothing to do with Southern Miss or volleyball. Favre had invested $250,000 in Prevacus, a company that was ostensibly trying to develop a quick-acting concussion drug, making him its largest outside investor… In late 2018, Prevacus was looking for more funding.[39]

On December 6, 2018, Prevacus Chief Executive Officer Jake VanLandingham texted Bryant: "[W]e want you on the team and can offer stock." A few weeks later, Bryant attended a dinner with VanLandingham, Favre, New Orleans businessman Joe Canizaro, and others. After the dinner, Favre texted Bryant: "It's 3rd and long and we need you to make it happen!!" Bryant responded: "I will open a hole."[40]

Shortly after, Davis sent a calendar invite for a meeting at Favre's home. The invite said Favre and Bryant wanted "to discuss the Educational Research Program that addresses brain injury caused by concussions. They also want to discuss the new facility at USM.'"[41] During this meeting, New and MCEC agreed to send $1.7

---

[39] ROA.46 (emphasis added).

[40] ROA.46-47.

[41] ROA.47.

million to Prevacus. Bryant did not attend the meeting, but according to the Article, "*his presence was felt*."[42] The Article summarizes the arrangement:

> VanLandingham and Favre got their cash infusion; Bryant's ally, Canizaro, had the inside track on a real estate deal; and Bryant had VanLandingham dangling company stock for him.[43]

According to the Article, "Bryant appeared unconcerned White would discover his involvement in the Prevacus deal. Two days after Bryant became a private citizen again, [ ] VanLandingham texted him, offering stock. VanLandingham described it as 'a company package for all your help.' Bryant wrote back: 'Sounds good. Where would be the best place to meet? I am now going to get on it hard.'"[44] The Article concludes, "*Though the former governor indicated he would accept Prevacus stock*, he either ran out of time or suddenly changed his mind before the arrests."[45]

## 2. The Complaint

Bryant claims he "did not instruct anyone to use [welfare] funds to construct the USM volleyball facility," "did not instruct anyone to invest [welfare] funds in

---

[42] ROA.49 (emphasis added). MCEC ultimately sent $2.2 million to Prevacus and another VanLandingham company, PresolMD. *See* ROA.50.

[43] ROA.50.

[44] ROA.67.

[45] ROA.73-74 (emphasis added).

Prevacus,"[46] "did not agree to accept stock in Prevacus,"[47] and did not "plot" or "scheme" with anyone.[48] He denies several additional statements in the Article[49] and claims its overall theme is false and defamatory.[50]

In support of the actual malice element of his claims, Bryant alleges he has not been accused of civil or criminal wrongdoing,[51] and that the Article overlooks objective evidence of his innocence.[52] Bryant contends the Article repackages defamatory statements published by *Mississippi Today* and attaches and incorporates the SAC as an exhibit.[53]

### a. The evidence does not prove that Bryant misdirected welfare funds to the volleyball facility project.[54]

On April 20, 2017, Favre texted Bryant, explaining that he and his wife were "building a volleyball facility on campus" and asked for Bryant's help "get[ting]

---

[46] ROA.13.

[47] ROA.16.

[48] ROA.13; ROA.14; ROA.16.

[49] ROA.13-16; ROA.20-25.

[50] ROA.6-7; ROA.25.

[51] ROA.14; ROA.20; ROA.24.

[52] ROA.20.

[53] ROA.7.

[54] On September 24, 2022, *Mississippi Today* published an article discussing a filing in the MDHS state court action. This article is referenced in the SAC. *See* ROA.189-190. Bryant provided the district court with the filing and its exhibits. *See* ROA.378-835.

donations and or sponsorships" to offset construction costs.[55] Bryant responded: "Of course I am all in on the [v]olleyball facility… We will have that thing built before you know it. One thing I know how to do is raise money."[56] Three months later, Favre forwarded the "[l]atest plans" for the facility and explained: "I'm trying to get sponsors, donations etc… if we can find a contractor that would say hey rather than give you money I'll build [it] for free!! Maybe you [k]now of someone[?]" Bryant told Favre that he was "all over it."[57]

Davis committed $4 million to the project during a meeting held on July 24, 2017. Bryant was unaware of this meeting and Davis's commitment.[58] USM agreed to accept the payment if an additional $1 million was allocated.[59] Special Assistant Attorney General Stephanie Ganucheau – the mother of *Mississippi Today* editor-in-chief Adam Ganucheau[60] – reviewed the arrangement and recommended that the IHL Board of Trustees approve it.[61] The board approved the deal and outlined its

---

[55] ROA.414.

[56] ROA.414-415.

[57] ROA.415.

[58] ROA.416.

[59] ROA.43.

[60] *Mississippi Today* concealed Ms. Ganucheau's involvement for two-and-a-half years to stifle speculation of whether she may have been among the unnamed "others" referenced in the guilty plea entered by MCEC Assistant Executive Director Zach New. *See* ROA.155-165.

[61] ROA.419-420.

terms in the meeting minutes.[62] Bryant was not involved in these discussions, Ganucheau's recommendation, or the board's approval.[63]

In March 2019, Favre learned that construction bids were significantly higher than anticipated and requested additional funding from Davis and New.[64] On May 30, 2019, New told Favre that she and Davis were willing to cover the remaining costs, but it "may have to be in a couple of payments."[65] Davis and New did not seek Bryant's consent to the payments, and Bryant was unaware they had agreed to make them.

MDHS announced Davis's resignation on July 8, 2019, before he had directed additional funds to the project.[66] Without Davis in place, Favre and New pressed Bryant on several occasions to direct welfare funds to the project.[67] Bryant refused these and other welfare fund requests, explaining that such expenditures must comply with strict legal requirements.[68]

---

[62] ROA.419.

[63] ROA.156.

[64] ROA.425-426.

[65] ROA.426.

[66] ROA.427; ROA.54.

[67] ROA.428-429; ROA.432-449.

[68] ROA.432-435; ROA.441-446.

New and Favre regrouped and proposed naming the facility after Bryant. The proposal explained that the facility would host "programs and resources which enable a wide network of support designed to impact and stabilize the whole family."[69] Bryant noted that the proposal was unclear about how "the money will be used,"[70] and told Favre that it needed greater detail – "[l]ike how many times the facility will be used and how many child[ren] will be served and for what specific purpose."[71] Favre sent Bryant an amended proposal that removed Bryant's name from the proposed facility, among other things, and asked if it was sufficient.[72] Bryant responded: "We will see soon. I would have listed the number of people proposed to be reached by the program and the number of employees necessary to achieve these goals."[73]

The *Mississippi Free Press* interviewed Freeze on September 16, 2022 ("MFP Article").[74] The MFP Article explains that Freeze told New on September 6, 2019, that MDHS had approved $1,172,992 of "new funds" to cover previous expenditures

---

[69] ROA.436.

[70] ROA.438.

[71] ROA.440.

[72] ROA.440.

[73] *Id.*

[74] *See* the article cited at ROA.446, *In-Depth: How Brett Favre Got $6 Million in Welfare Funds For A Volleyball Stadium*, https://mississippifreepress.org/in-depth-how-brett-favre-secured-6-million-in-welfare-funds-for-a-volleyball-stadium/.

made "at the direction of former Executive Director John Davis." However, MDHS

rejected MCEC's request for an additional $804,213 because it was "not allowed

under federal regulations."[75] Freeze explained that –

> MDHS officials "felt like we had an obligation because the (previous)
> executive director (Davis) had verbally approved" some of New's requests.
> But he was working to implement new controls at MDHS that had been sorely
> lacking under Davis, who often made verbal agreements without
> accompanying paperwork. Part of that process included implementing a
> [request for proposals ("RFP")] process, which would require entities like
> New's to make formal proposals for funding.[76]

Regarding MCEC's bid for 2020 funding, Freeze explained, "Our

independent team reviewed it along with everybody else's, and I funded the

programs that we thought were appropriate under TANF guidelines. …In Nancy's

case, they got less than half of what they had requested." Freeze could not recall

whether MCEC's grant included funding for the "volleyball stadium or USM-related

money," but he said his senior team was not involved in the review to "maintain

[the] integrity of the RFP."[77] MDHS did not advance additional funds for the

volleyball facility. Favre paid over $1.4 million and raised additional money to cover

the remaining costs.[78]

---

[75] MFP Article at 25.

[76] ROA.446.

[77] ROA.446.

[78] *See* the hyperlinked article at ROA.74, *Brett Favre says the welfare agency didn't help satisfy his volleyball pledge, but Aaron Rodgers, Jimmy Buffett and others did*, https://mississippitoday.org/202304/13/brett-favre-volleyball-aaron-rodgers-jimmy-buffett/.

On December 18, 2019, Bryant texted New, asking if MDHS had awarded additional funding. New said it had. Bryant responded with a smiley face emoji.[79] Freeze addressed this exchange: "The governor can send smiley faces back, but within two weeks, he said don't fund her and don't fund Christi Webb at the Family Resource Center."[80]

In sum, Bryant agreed to help Favre raise private funds; he refused to direct welfare funds to the project unilaterally; he told Favre that MCEC's application for MDHS funding of the volleyball facility should be detailed; he did not interfere with MDHS's review of MCEC's bid; and he stopped MCEC's funding when he learned New may have illegally misused welfare funds. These actions were perfectly legal and certainly do not suggest Bryant's involvement in a scheme to misspend welfare funds.

### b. The evidence does not prove that Bryant misdirected welfare funds to Prevacus or that he agreed to accept company stock.

On December 6, 2018, VanLandingham asked Bryant for assistance getting "a group of investors together" for a presentation. VanLandingham said he could "offer stock," but admitted he did not "know the rules." Bryant did not respond to

---

[79] ROA.447.

[80] *Id.*

the stock overture. He replied: "Just let me know and we will call a team meeting at the Governor's Mansion."[81]

Bryant, Favre, and VanLandingham met at the Governor's Mansion in the early evening of December 26, 2018. VanLandingham asked Bryant if he could accept Prevacus stock. Bryant declined, explaining he could not accept stock for anything he might do in office. The men subsequently traveled together to a local restaurant for a dinner meeting.[82]

On January 2, 2019, New, Davis, and others met with Favre to discuss Prevacus. During the meeting, New agreed to send $1.7 million to the company.[83] Bryant was unaware that New and Davis had met with Favre and was unaware of New's agreement.[84]

Eleven months later, VanLandingham texted Bryant: "Governor, can we bring you onboard with ownership now?" Bryant responded: "Cannot till January 15th. But would love to talk then. This is the type of thing I love to be a part of. Something that saves lives…"[85] Bryant explained in an interview with *Mississippi Today*:

---

[81] ROA.222-223.

[82] ROA.223.

[83] ROA.49.

[84] ROA.133-134.

[85] ROA.223.

"What I was saying is I can't talk to you until January 15th. I don't even want to talk about it until January 15th. And then you can come in and talk to me."[86]

On January 16, 2020, two days after Bryant left office, VanLandingham texted Bryant: "Now that you're unemployed, I'd like to give you a company package for all your help. Let me know when you come up for air, but know we want and need you on our team!!!" Bryant responded: "Sounds good. Where would be the best place to meet[?] I am now going to get on it hard."[87]

Several points arise from this exchange. First, VanLandingham did not offer "a company package" to Bryant. He said that he would "like to give" Bryant a company package, implying Bryant had not previously agreed to accept stock and could reject whatever he may offer. Second, VanLandingham did not specify the terms of the "company package," leaving Bryant unclear what may be offered. Third, VanLandingham did not explain the "help" and did not say he was offering Bryant stock in exchange for services performed in office. Considering Bryant's previous refusal to accept stock and their later conversation, the most reasonable interpretation is that VanLandingham attempted to entice Bryant's consulting firm to accept Prevacus as a client through Bryant as its agent. Fourth, Bryant did not agree to receive a "company package." He instead indicated that he would like to

---

[86] ROA.131-132.

[87] ROA.224.

meet to discuss the details further. The phrase "get on it hard" is a form of rhetorical hyperbole. Fifth, regarding whether Bryant's firm could assist Prevacus, Bryant explained that the representation "would have had to go through our internal review here with lawyers, and then we would have asked (Ethics Commission director) Tom Hood, 'Can you review it?'" Bryant's firm had hired an attorney with Butler Snow LLP to ensure its engagements complied with applicable law. Bryant explained: "[I]t wouldn't have just been, 'OK, let's go to work.' It's just not that easy."[88]

Six days later, Bryant, VanLandingham, and Favre's friend Poncho James discussed Prevacus in a telephone call. Toward the end of the discussion, VanLandingham mentioned offering stock in exchange for the services of Bryant's firm. Bryant told VanLandingham that they could address the matter at a later time.[89] VanLandingham's recollection is consistent with Bryant's. He told *Mississippi Today*:

> The governor was always straight up. There was never any stock exchanged. There was never any money exchanged. He just wanted to help. And we never did a deal for him to come on with his consulting firm, and that could be because this (the arrests) happened. We were probably working towards having the governor, post-governorship, help us, and I think that would have been great.[90]

---

[88] ROA.224-225.

[89] ROA.225.

[90] ROA.226.

In his interview, Bryant asked *Mississippi Today* reporter Anna Wolfe to consider the implausibility of the notion that he masterminded the welfare misspending. Bryant said, "[T]hink about this now, Anna, if I had set all of this up like this, would I, in the middle of this, have called the state auditor and said, 'Come in and begin this review'? Would I have hired the SAC (Special Agent in Charge) of the FBI to come in and run a state agency? If I had thought, 'Well, something's going wrong here, and I'm a part of it, but I'm going to have the SAC come in and run the shop.' I mean, come on. That just doesn't make good sense."[91]

In sum, Bryant did not instruct New to invest welfare funds in Prevacus; he refused to accept stock for the efforts he undertook on the company's behalf while in office; and he did not agree to represent the company after leaving office. As with the volleyball facility, Bryant's actions were perfectly legal and certainly do not suggest he was involved in a scheme to misspend welfare funds.

### c. Neither White nor independent auditors hired by MDHS determined that Bryant misspent welfare funds.

On October 12, 2021, White served written demands on several individuals and entities. In his press release, White said that "[a]fter two years of work," his office had "found tens of millions of dollars of misspending" within MDHS. He explained that his findings were confirmed "by an independent forensic audit

---

[91] ROA.137.

commissioned by DHS" and "conducted by an independent, outside CPA firm from Maryland."[92] He issued demands to Davis for $96.313 million, to "the board and leadership" of MCEC, including New, for $68.159 million for their role in misspending or improperly dispersing portions of the $77 million, and to Favre Enterprises for $828,000 for its failure to fulfill a contract.[93]

During the investigation, White obtained fourteen pages of texts between Davis and Bryant in "the four months leading up to Davis's ousting,"[94] and numerous texts between Bryant, Favre, and VanLandingham.[95] However, White did not issue a demand to Bryant.

Wolfe interviewed White on October 14, 2021. During the interview, Wolfe said she had "now consumed enough information" and had "enough details of the way that Phil Bryant and John Davis interacted." She then said, "Phil Bryant directed John Davis's actions."[96] Seemingly shocked, White asked: "When you say Phil Bryant directed John Davis's actions, are you saying that there is specific evidence that Phil Bryant told John Davis to spend money in certain ways?" Wolfe responded: "Yeah… I mean, that's clear." White replied: "We would love to see any evidence

---

[92] ROA.86.

[93] ROA.86-87.

[94] ROA.201.

[95] ROA.140-141; ROA.167-170.

[96] ROA.122.

to that effect that anybody has. I would say that … we have gathered tons of evidence in this case. But if there's any documented evidence or anything like that that exists, we need to make sure that we have it."[97] Wolfe backtracked:

> I don't think you're going to find a piece of paper that shows Phil Bryant telling John Davis, for example, to give money to Prevacus. But there were meetings that took place, and there were examples of him directing [Davis] to do other things with money. And those specific things might not be part of the criminal allegations, but it shows the pattern of how [Bryant and Davis] communicated.[98]

White replied: "[T]here's nothing illegal, obviously, about a meeting," and again requested evidence of Bryant directing misspending.[99] Wolfe suggested that Bryant may have verbally told Davis to fund specific vendors. White observed: "If John Davis believes that Phil Bryant has some sort of culpability here, then it's obviously in his best interest to disclose all of that as soon as possible, whether it's to me or if he doesn't want to disclose it to me, the FBI, or federal prosecutors, or [Hinds County District Attorney] Jody Owens, or any of the other parties that are capable of seeing this, who have cases under their jurisdiction or investigations under their jurisdiction related to this."[100] Later, White summarized the welfare fraud scheme in simple terms:

---

[97] ROA.122-123.

[98] ROA.123.

[99] ROA.123.

[100] ROA.124.

John Davis misspent a bunch of money, and then he handed a bunch more money to MCEC and [Webb's organization, Family Resource Center of North Mississippi Inc.], who he then failed to monitor, who also misspent a bunch of money.[101]

On April 4, 2022, *Mississippi Today* published its first article addressing Bryant's Prevacus texts.[102] Five months later, on September 13 and 24, 2022, it published articles addressing Bryant's volleyball texts.[103] Despite *Mississippi Today*'s reporting, his office's two-year investigation, and his continuing obligation to recoup misspent public funds,[104] White has not accused Bryant of wrongdoing or sought to recoup money from him.

### d. MDHS did not sue Bryant.

On May 9, 2022, MDHS sued thirty-eight individuals and entities to recoup misspent welfare funds, including Davis, New, and Favre.[105] MDHS did not sue Bryant. Two and a half months later, MDHS terminated Brad Pigott, the attorney it had retained to prosecute the case.[106] Following Pigott's termination, MDHS hired

---

[101] ROA. 125. *Mississippi Today* acknowledged in a May 2, 2022, editorial that White told the publication "in October 2021 that he had not seen evidence that Bryant broke any law." *See* ROA.178.

[102] ROA.167-70.

[103] ROA.188-190.

[104] ROA.150-154.

[105] ROA.179-181. *See Mississippi Department of Human Services v. Mississippi Community Education Center, Inc., et al.*, No. 25CI1:22-cv-286-EFP (Hinds Cty., Miss. Cir. Ct.).

[106] ROA.183.

Jones Walker LLP to prosecute its civil claims. MDHS filed an amended complaint on December 13, 2022, that alleged, among other things, additional claims against Favre and the USM Athletic Foundation.[107] MDHS did not add Bryant as a defendant. This case is still pending.

### e. Criminal authorities did not prosecute Bryant.

White arrested Davis, New, and several others on February 5, 2020.[108] New pleaded guilty to federal wire fraud on April 20, 2022, and two days later, she pleaded guilty to multiple state law felonies.[109] On September 22, 2022, Davis pleaded guilty to numerous state and federal felonies.[110] New and Davis must report information implicating Bryant in a crime to state and federal authorities. Despite this obligation, no government authority has questioned Bryant, much less accused him of a crime.[111]

Moreover, the statute of limitations has likely expired on crimes that federal authorities could have conceivably alleged against Bryant. Davis pleaded guilty to violating 18 U.S.C. § 371 and 18 U.S.C. § 666(a)(1)(A). *U.S. v. Davis*, No. 3:22-cr-104-CWR-LGI (S.D. Miss. Sept. 22, 2022), Plea Agreement [Doc. 14]. These

---

[107] ROA.192.

[108] ROA.85.

[109] *Id.*

[110] *Id.*

[111] ROA.233; ROA.237.

offenses are subject to the five-year statute of limitations outlined in 18 U.S.C. § 3282. *U.S. v. Ely*, 140 F.3d 1089, 1090 (5ᵗʰ Cir. 1998); *U.S. v. Shoemaker*, No. 2:11-cr-38-NBB-DAS, 2012 WL 313620, at *1 (N.D. Miss. Feb. 1, 2012).

MCEC paid its final $2.5 million installment toward the construction of the volleyball facility on December 5, 2017.[112] If the statute of limitations commenced on that date (when the purported conspiracy's purpose would have ended),[113] it would have expired on December 5, 2022 – over five months before the Article's publication. As for Prevacus, Bryant told VanLandingham on February 10, 2020, that he could "have no further contact" with the company.[114] If the statute of limitations commenced on that date, it would have expired on February 10, 2025 – over four months ago.

## SUMMARY OF THE ARGUMENT

Bryant alleged substantial circumstantial evidence of actual malice, including the defendants' (1) rejection of innocent interpretations of the evidence in favor of the most damaging interpretations, (2) publication of sensational and inherently implausible claims, (3) knowledge that their claims would harm Bryant, (4) rejection

---

[112] ROA.422.

[113] *U.S. v. Heard*, 709 F.3d 413, 428 (5ᵗʰ Cir. 2013) (conspiracy ends when the "conspiratorial purpose" is defeated).

[114] *See* article cited on ROA.167 n.59 at 18, *Phil Bryant had his sights on a payout as welfare funds flowed to Brett Favre*, https://mississippitoday.org/2022/04/04/phil-bryant-brett-favre-welfare-scandal-payout/.

of White's statements, (5) rejection of statements made by Bryant, VanLandingham, and Freeze, (6) reliance on Burnett's speculation and Davis's cryptic quote, (7) failure to investigate adequately, (8) deliberate distortion of facts, (9) pursuit of a preconceived storyline, and (10) refusals to retract. When considered collectively, taken as true, and viewed in a light most favorable to Bryant, these facts could plausibly support an actual malice finding.

This Court should reverse and find that Bryant plausibly pleaded actual malice. However, if this Court decides that Bryant should have pleaded facts supporting actual malice with greater specificity, it should reverse and grant leave to amend.

<u>**ARGUMENT**</u>

## A. Standard of Review

This Court reviews "a district court's decision on a Rule 12(b)(6) motion *de novo*, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff." *Santander v. Salazar*, 133 F.4th 471, 477 (5th Cir. 2025) (quoting *Ferguson v. Bank of New York Mellon Corp.*, 802 F.3d 777, 780 (5th Cir. 2015)) (cleaned up). "To survive a motion to dismiss, the complaint must contain 'sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "The plaintiff's well-pleaded factual

allegations enjoy a presumption of truth." *Id.* (quoting *Pena v. City of Rio Grande

City*, 879 F.3d 613, 620 (5th Cir. 2018) (cleaned up). "Further, all questions of fact

and any ambiguities in the controlling substantive law must be resolved in the

plaintiff's favor," and "a well-pleaded complaint may proceed even if it appears that

a recovery is very remote and unlikely." *Walker v. Beaumont Independent School

District*, 938 F.3d 724, 735 (5th Cir. 2019) (quoting *Lewis v. Fresne*, 252 F.3d 352,

357 (5th Cir. 2001) and *Twombly*, 550 U.S. at 556). "But the court does not accept as

true 'conclusory allegations, unwarranted factual inferences, or legal conclusions.'"

*Santander*, 133 F.4th at 477 (quoting *Hodge v. Engleman*, 90 F.4th 840, 843 (5th Cir.

2024) (cleaned up)).

   In determining whether a plaintiff's claims survive a motion to dismiss, the

court may consider the facts outlined in the complaint, documents attached to the

complaint, and matters of which judicial notice may be taken. *Walker*, 938 F.3d at

735. "Judicial notice may be taken of matters of public record." *Id*. In this case,

Bryant relies on the complaint and its exhibits,[115] and a state court filing and its

exhibits.[116] These documents are properly before the Court.

---

[115] ROA.6-307.

[116] ROA.378-835.

## B. Bryant plausibly pleaded actual malice.

Public officials cannot prove defamation without establishing actual malice, "that is, [the defendant made the statement] with knowledge that it was false or with reckless disregard of whether it was false or not." *Rebozo v. Washington Post Co.*, 637 F.2d 375, 378 (5th Cir. 1981), *cert. denied*, 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279-80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967)). "Absent an admission by the defendant that he knew his material was false or that he doubted its truth, a public figure must rely upon circumstantial evidence to prove his case." *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983) (citing *Herbert v. Lando*, 441 U.S. 153, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979)). Additionally, because "proof of actual malice calls a defendant's state of mind into question," this element "does not readily lend itself to summary disposition." *US Dominion v. Byrne*, 600 F. Supp. 3d 24, 33 (D. D.C. 2022) (quoting *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979)).

The district court's core error was its refusal to resolve all fact questions and legal ambiguities in the Bryants' favor. *Palin v. New York Times Company*, 940 F.3d 804, 815 (2nd Cir. 2019) ("The test is whether the complaint is plausible, not whether

it is less plausible than an alternative explanation.") When this is done, the cumulative impact of the facts alleged plausibly supports an actual malice finding.

### 1. The defendants rejected innocent interpretations of the evidence in favor of the most damaging interpretations.

In *Time, Inc. v. Pape*, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the U.S. Commission on Civil Rights issued a report that quoted from a complaint filed by James Monroe against Chicago police officers. *Id.* at 280-81. A week after the Commission issued the report, *Time* magazine published a story quoting "at length from the summary of the Monroe complaint, without indicating in any way that the charges were those made by Monroe rather than independent findings of the Commission." *Id*. at 282.

The Supreme Court granted certiorari to decide whether *Time* magazine's failure to include the word "alleged" was sufficient to sustain an actual malice finding. *Id.* at 283. The Court acknowledged that the report dealt with a serious problem before turning its attention to the eleven "typical cases of police brutality" outlined therein. *Id.* at 287. According to the Court, the report's description of the incidents was "extravagantly ambiguous." *Id.* Therefore, "there was a logically inevitable implication that the Commission must have believed that the incidents described had in truth occurred." *Id*. at 289.

With this in mind, the Court found that "*Time*'s omission of the word 'alleged' amounted to the adoption of one of a number of possible rational interpretations of

a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of 'malice' under *New York Times*. To permit the malice issue to go to the jury because of the omission of a word like 'alleged,' despite the context of that word in the Commission Report and the external evidence of the Report's overall meaning, would be to impose a much stricter standard of liability on errors of interpretation or judgment than on errors of historic fact." *Id.* at 289-90; accord, *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 513, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (a description of music emanating from a speaker system was not actionable because "the difference between hearing violin sounds move around the room and hearing them wander back and forth fits easily within the breathing space that gives life to the First Amendment"). Before concluding, the Supreme Court added "a final cautionary note. Nothing in this opinion is to be understood as making the word 'alleged' a superfluity in published reports of information damaging to reputation. Our decision today is based on the specific facts of this case, involving as they do a news report of a particular government publication that purported to describe the specific grounds for perceiving in 1961 'a serious problem throughout the United States.'" *Pape*, 401 U.S. at 292; *Levine v. CMP Publications, Inc.*, 738 F.2d 660,669 (5th Cir. 1984) (observing that *Pape* is "a very fact-specific case").

Ten years later, this Court reached a decision that may initially appear to conflict with *Pape*. In *Rebozo*, *Newsday* published articles describing a lawsuit involving allegations that Key Biscayne Bank had converted shares of stolen stocks. Some of the stock had been pledged as collateral for a loan and "was later sold when the loan was called." 637 F.2d at 376.

*Washington Post* reporter Ronald Kessler reviewed the case file and studied the deposition of investigator George H. Riley, Jr. *Id*. Riley testified that he told the chairman of the board and president of the bank, Charles Rebozo, that he was investigating the theft and provided Rebozo with the share numbers. *Id*. Kessler called Riley "to get a feeling from him, at least as to whether he understood the possible significance of his testimony," but he did not ask Riley whether his testimony was accurate. *Id*. at 377. Kessler also contacted Rebozo's attorney, who denied that Riley said the stock had been stolen. *Id*.

Whether Rebozo or the bank cashed the stock was the subject of an internal memorandum from Kessler to his editor. Kessler acknowledged in the memorandum that no witness had addressed the issue. *Id*. Nonetheless, *The Washington Post* published a front-page article that accused Rebozo of cashing the stock despite knowing it had been stolen. Notably, the article acknowledged that Rebozo's attorney denied the accusation. *Id*.

Rebozo sued The Washington Post Company for defamation. The district court granted summary judgment, and Rebozo appealed. *Id*. at 376. This Court reversed, finding genuine issues of material fact relating to Riley's conversation with Rebozo and Kessler's review of it. This Court explained:

> In investigating the story, even though Kessler went to the trouble of calling Riley, he failed to review with Riley the words in Riley's earlier deposition upon which Kessler eventually based the article's lead. Regardless of whether Riley knew at the time of his conversation with Rebozo whether the pledged stock had in fact been stolen, the seminal question may be what Riley actually told Rebozo before the stock was sold to cover the loan… Despite Kessler's professed belief in the veracity of Riley's deposition testimony, ***Kessler's resolution of the obvious ambiguity whether Riley told Rebozo the stock was (a) missing, (b) stolen, or (c) missing or stolen, in favor of the most potentially damaging alternative creates a jury question on whether the publication was indeed made without serious doubt as to its truthfulness.***

*Id.* at 381-82 (citing *St. Amant v. Thompson*, 390 U.S. 727, 732, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)) (emphasis added). This Court also determined that Kessler's memorandum presented a genuine issue of material fact because it stated "that if the bank, rather than Rebozo, had actually cashed the stock, the article's lead paragraph would have to be modified." *Id*. at 382. The Court elaborated:

> This memorandum, plus the fact that Kessler resolved the uncertainty expressed in it in such a way as to cast plaintiff Rebozo in the worst possible light and to make for Kessler a front-page story of an episode which otherwise might not have commanded any significant attention, when taken in a light most favorable to Rebozo, could amount to evidence of the reporter's reckless disregard for the truth or falsity of the assertion that "Charles G. (Bebe) Rebozo, President Nixon's close friend, cashed $91,500 in stolen stock.…"

*Id.* (citing *St. Amant*, 390 U.S. at 731-32; *Sullivan*, 376 U.S. at 279-80); accord, *Time, Inc. v. Ragano*, 427 F.2d 219, 221 (5th Cir. 1970); *Warford v. Lexington Herald-Leader Co.*, 789 S.W.2d 758, 773 (Ky. 1990).

Four years later, in *Tavoulareas v. Piro*, 759 F.2d 90 (D.C. Cir. 1985), the D.C. Circuit was presented with a defamation case brought against *The Washington Post* and several other defendants. "The Tavoulareases alleged that they were defamed by articles in the *Post* which stated, among other things, that William Tavoulareas, as President and Chief Executive Officer of Mobil Oil Corporation ("Mobil"), had used his influence to 'set up' his son Peter in the shipping business, and then had diverted some of Mobil's shipping business to him. The basic theme of the article was that William Tavoulareas had misused his position and corporate assets to benefit his son." *Id.* at 98.

At trial, the jury returned verdicts in favor of the plaintiffs. However, the trial court granted judgment notwithstanding the verdict ("JNOV") for the defendants. *Id.* (citing *Tavoulareas v. Washington Post Co.*, 567 F. Supp. 651 (D. D.C. 1983)). The court of appeals reversed the JNOV granted in favor of the *Post* defendants and remanded. *Id*.

At the outset of its actual malice analysis, the court explained that, "In *any* case where the mental state of the actor is at issue, it can be proved by the *cumulation* of circumstantial evidence." *Id*. (quoting R. Sack, *Libel, Slander, and Related*

*Problems* 214 (1980)) (emphasis in original). Among the circumstantial evidence was the defendants' resolution of inferences adverse to the plaintiffs. The court recognized a general principle: "It is well settled that in a situation where the facts are ambiguous, the mere selection of the most damaging inference by the reporter does not, *alone*, indicate actual malice." *Id.* at 101 (emphasis in original). The court then observed that *Pape*'s holding "makes obvious sense; since the focus of the malice inquiry is *subjective*, not *objective*, the mere selection of a single damaging inference is ordinarily not *sufficient* to prove actual malice. The question is whether the reporter believed that the selected inference was true." *Id*. at 101-02 (emphasis in original).

The court turned its attention to whether *Pape* foreclosed the plaintiff's ability to prove actual malice with the defendants' consistent selection of adverse inferences against the plaintiffs:

> The defendants argue from *Pape* that the *consistent* selection of the inferences most damaging to the Tavoulareases would be irrelevant to the issue of actual malice. Such an assertion, however, is entirely inconsistent with the *subjective* nature of the malice inquiry. ***One who publishes a story containing a damaging inference which he knows or seriously suspects is false is not shielded by the fact that what he wrote was objectively a reasonable inference.*** Certainly, a defendant's selection of a reasonable inference from among a number of ambiguities, whether damaging or not, may be evidence that he acted without malice. ***But a defendant's selection of the most damaging inference – an inference which is, in fact, false – may be probative of a determination to incorrectly describe the plaintiff, place him in the most damaging light, and thereby with other evidence demonstrate a state of mind that is probative of a reckless disregard for truth.***

> *Pape* offers no support for the defendants' analysis of the editorial conduct here. The Supreme Court explicitly stated only that choices made by reporters in the face of ambiguities were not *enough* to prove actual malice – it did *not* say that they were entirely *irrelevant* to the issue.

*Id.* at 102 (italics in original; bold and italics added). The court next reviewed *Rebozo* and rejected "two misconceptions" about the case. "The first … is that the plaintiff must have at least one piece of evidence which, *by itself*, proves actual malice. This has been refuted previously. The plaintiff may clearly and convincingly prove actual malice by a cumulation of many pieces of evidence, no one of which, by itself, is clear and convincing. Though '[a] brick is not a wall,' many bricks are." *Id.* (quoting E. Cleary, *McCormick's Handbook on the Law of Evidence* § 185 (2d ed. 1972)) (emphasis in original).

The second misconception was "the contention that *Rebozo* must have held that deliberate slanting or consistent selection of damaging inferences was a piece of evidence which *in and of itself* would prove actual malice." *Id.* (emphasis in original). The court rejected this contention, explaining "*Rebozo* merely held that resolution of ambiguities in the most damaging light *could amount to evidence* of the reporter's reckless disregard for the truth or falsity of the assertion, … – *i.e.*, some evidence of actual malice. Since *Pape* simply held it was not *enough* evidence to demonstrate actual malice, the two cases are fully consistent. There is thus no question of 'saving' the verdict solely through the logic expressed in *Rebozo*.

***Evidence of deliberate slanting and consistent selection of damaging inferences***

*may constitute probative evidence of actual malice and must be examined and evaluated, not ignored, in conjunction with all of the other circumstantial evidence produced by the plaintiffs.*" *Id.* at 102-03 (internal citation omitted) (italics in original; bold and italics added). The court concluded:

> *In sum, to the extent that the facts known to the defendants, like those in Rebozo, were susceptible of more than one possible interpretation, the numerous instances in which the defendants selected the most damaging – and most sensational – alternative is some evidence which a jury, and an appellate court on review, can evaluate in determining whether publication was made with reckless disregard of whether it was false or not.*

*Id.* at 102-03 (emphasis added). Following its decision, the appellate panel denied rehearing, explaining that "[t]he present case involves not a single misstatement or malapropism but rather a pattern of construing the underlying events, despite serious doubts about their truthfulness, to support a premature notion of the story, conceived during the very first interview of a source known to be highly biased and prejudiced." *Tavoulareas v. Piro*, 763 F.2d 1472, 1475-76 (D.C. Cir. 1985).

Sitting *en banc*, the court subsequently vacated its decision and denial of rehearing and affirmed the trial court's JNOV. *Tavoulareas v. Piro*, 817 F.2d 762 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 870, 108 S.Ct. 200, 98 L.Ed.2d 151 (1988). In doing so, the court once again explained that "a plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence." *Id.* at 789. However, the court found that the *Washington Post* did not engage "in a pattern of 'slanted reporting'

38

indicative of actual malice" because its reporter "included most of the information furnished by Mobil in the article (with no substantial omissions) and suppressed no information that would have proved the article incorrect." *Id*. at 797.

Unlike the reporter in *Tavoulareas*, Rosenberg suppressed information that would have proved the Article incorrect. He did not offer innocent interpretations of Bryant's texts and related evidence and did not acknowledge the clear implication arising from the fact that state and federal authorities had not brought civil or criminal charges against Bryant despite possessing the same information upon which the Article was based and unlimited access to cooperating witnesses with firsthand knowledge of the underlying events – namely, that the evidence does not prove Bryant misspent welfare funds.[117] On the contrary, Rosenberg speculated that federal prosecutors were building a case against Bryant, one "domino" at a time.[118]

This case squares with *Rebozo* because the Article repeatedly interprets Bryant's texts and related evidence in the most damaging and sensational light possible, even though an innocent alternative interpretation exists. A jury could plausibly conclude that Bryant did not misdirect welfare funds to the volleyball facility project and, in fact, he refused to do so on several occasions; that the state

---

[117] The inclusion of Bryant's denials (*see* ROA 73-74) does not absolve the defendants of actual malice. *Rebozo*, 637 F.2d at 377; *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 837 n. 6 (6th Cir. 1988), *aff'd*, 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

[118] ROA.72.

auditor, criminal authorities, and MDHS have not accused Bryant of directing welfare funds to the project because the evidence does not support that conclusion; and that the defendants promoted their sensational volleyball narrative while knowing a more plausible and innocent interpretation of the evidence existed. Similarly, a jury could reasonably conclude that Bryant did not direct welfare funds to or agree to accept stock from Prevacus; that the state auditor, state and federal criminal authorities, and MDHS have not accused Bryant of such because the evidence does not support that conclusion; and that the defendants promoted their sensational Prevacus narrative while knowing a more plausible and innocent interpretation of the evidence existed. These determinations would support a finding of actual malice.

**2. The Article makes sensational and inherently implausible accusations.**

The article accuses Governor Bryant of conspiring with admitted felons and a Hall of Fame quarterback to misspend millions of welfare dollars, agreeing to accept payment for his efforts, and manipulating events to make himself appear innocent. The sensational nature of these accusations evidences actual malice. *Blanke v. Time, Inc.*, 308 F. Supp. 378, 380 (E.D. La. 1970); *Alioto v. Cowles Communications, Inc.*, 519 F.2d 777, 78 (9th Cir. 1975). Furthermore, considered within their proper context, they are inherently implausible.

In *US Dominion v. Powell*, 554 F. Supp. 3d 42 (D. D.C. 2021), Michael Lindell accused a group of companies involved in the sale of electronic voting machines ("Dominion") of engaging in election fraud. *Id.* at 53. He supported his accusation with a spreadsheet from an online blog that purportedly proved President Trump "got around 79m votes to 68m votes for Biden!" *Id.* at 55. He also appeared in an online video program, claiming he had "'a cyber footprint from inside the [Dominion] machines' proving that the machines were hacked 'by foreign countries, starting with China.'" *Id.* Lindell included this same material in a documentary that suggested "then-Attorney General Bill Barr (who had stated that the Department of Justice had not seen evidence of widespread election fraud) was 'corrupt' and had been 'compromised.'" *Id.*

Dominion sued Lindell for defamation, and Lindell moved to dismiss. *Id.* at 55-56. Examining whether Dominion plausibly pleaded actual malice, the court noted, "As a preliminary matter, a reasonable juror could conclude that the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it." *Id.* at 63 (citing *St. Amant*, 390 U.S. at 732). The court also identified "other facts that make those claims even more obviously improbable (or at least indicate that a reasonable juror could conclude that those claims are inherently improbable)," including public statements by Barr and independent

audits. *Id*. For this and other reasons, the court concluded that Dominion plausibly pleaded actual malice. *Id*. at 63-64.

As in *US Dominion*, a reasonable juror could conclude that Bryant's involvement in a criminal conspiracy that state and federal prosecutors have ignored is so inherently improbable that only a reckless person would believe it. White's public statement, the audits conducted by his office, the conclusions reached by MDHS, its independent auditors and attorneys, and *Mississippi Today*'s inability to find an expert to opine that Bryant engaged in illegal activity[119] amplify this improbability. The inherent improbability of the Article's claims could reasonably support an actual malice finding.

### 3. The defendants knew they would harm Bryant.

In *Butts*, 388 U.S. at 170 (Warren, C.J., concurring in result), Chief Justice Warren noted as influential on the actual malice issue that "the Saturday Evening Post proceeded on its reckless course with full knowledge of the harm that would likely result from publication of the article." *Id.* In this case, the Article accuses Bryant of conspiring to defraud the state and speculates that federal prosecutors may be building a case against him. A jury could reasonably conclude that the defendants

---

[119] Two months before the Article's publication, *The Journalist's Resource* interviewed Wolfe and Ganucheau, who told the magazine that Wolfe reached "out to legal experts to try to report whether laws had been broken, but the case was too 'sprawling' for those experts to comment definitively." *See* ROA.129.

understood the harm that their story would cause Bryant. Such a determination would support an actual malice finding.

### 4. The defendants disregarded White's statements.

In *Batson v. Time, Inc.*, 298 So. 2d 100 (La. Ct. App. 1st Cir. 1974), *Life* magazine featured an article that implied Emmett Batson, a former chief counsel of the Louisiana Department of Revenue, "improperly permitted a $32,000,000.00 tax claim" to prescribe. The article claimed that Sperry-Rand Corporation, a company with alleged ties to purported Mafia member Carlos Marcello, owed the taxes. *Id*. at 103-04. Batson sued *Life*'s publisher, Time, which subsequently moved for summary judgment. *Id*. at 102.

Former Commissioner of Administration W.W. McDougall executed an affidavit for Batson, denying any connection between Batson and organized crime, the existence of a $32,000,000 tax claim, and that Batson had handled a tax claim against Sperry-Rand. McDougall explained that the Department of Revenue agreed with Sperry-Rand not to pursue a tax claim due to a decision this Court had reached in a similar case. Importantly, McDougall explained that he provided this information to *Life* before the article's publication. *Id*. at 105. The appellate court affirmed the denial of summary judgment because the affidavit posed "a genuine issue of material fact regarding actual malice, at least concerning the statement regarding Plaintiff's action in the Sperry-Rand matter." *Id*. at 108; *see also, Young*

*v. Gannett Satellite Information Network*, 734 F.3d 544, 548 (6ᵗʰ Cir. 2013); *Nader v. de Toledano*, 408 A.2d 31, 37, 54 (D.C. App. 1979), *cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980).

In this case, White said "he had not seen evidence that Bryant broke any law"[120] after having reviewed Bryant's texts with Davis, Favre, and VanLandingham, and all other evidence uncovered in his office's two-year investigation. A jury could plausibly determine that the defendants disregarded White's statements in favor of their sensational narrative. This conclusion could plausibly support an actual malice determination.

### 5. The defendants disregarded the firsthand accounts of Bryant, VanLandingham, and Freeze.

In *Cape Publications, Inc. v. Adams*, 336 So. 2d 1197, 1199-1200 (Fla. Ct. App. 1976), a newspaper reporter named Newcome published articles accusing a local building official, Donald Adams, of soliciting bribes from a construction supervisor, Bernard, and the mayor of a local community, Miller. *Id*. at 1198. One article mentioned that Bernard and Adams denied the solicitations but explained that Bernard's supervisor, Wilcox, had reported them to Newcome. Another article stated that Miller claimed Adams had requested payments from him. *Id*.

---

[120] ROA.178.

Adams sued the newspaper's publisher and Newcome for defamation. The evidence showed that Wilcox did not inform Newcome that Bernard had reported the solicitations; Bernard had not reported them; and Miller denied that Adams had requested improper payments. Furthermore, Miller informed Newcome that there had been open discussions between him, Adams, and the town council regarding compensating Adams for the "extra work" he had done for the town. *Id*. at 1199. In light of this, the Florida appellate court found that the jury could properly conclude that every time Newcome went to the firsthand sources of the information, they told him the statements were untrue. *Id*. at 1199-1200. Accordingly, the court determined there was "clear and convincing evidence" of actual malice. *Id*. at 1200; accord, *Harte-Hanks Commc'ns v. Connaughton*, 491 U.S. 657, 683, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989).

In this case, the Article dismisses firsthand accounts from Bryant, VanLandingham, and Freeze. A jury could reasonably conclude that the Article's dismissal of these statements and the failure to obtain quotes from Favre and Poncho Davis (the only other persons with direct knowledge of Bryant's communications with Prevacus) proves that the defendants acted with actual malice.

### 6. There are obvious reasons to doubt the information supplied by Carol Burnett and John Davis.

In addition to the texts, the Article attributes information to public records, *Mississippi Today*'s reporting, and quotes from individuals. None of the statements

attributed to public records accuse Bryant of wrongdoing.[121] The Article accurately restates Bryant's quotes to *Mississippi Today*[122] and correctly reports that Favre's attorneys produced a donor agreement.[123] Regarding the quotes, the Article cites Pigott,[124] law professor Lucian Dervan,[125] and unidentified sources.[126] The remarks from these individuals are either not directed at Bryant or are nonspecific. However, serious issues of reliability, credibility, and accuracy affect quotes provided by two other sources, Carol Burnett and John Davis.

### a. Carol Burnett

In *Prozeralik v. Capital Cities Communications, Inc.*, 626 N.E.2d 34 (N.Y. Ct. App. 1993), a television station broadcast that John Prozeralik, a local restaurateur, was the victim of an abduction and beating near Niagara Falls. During the trial, a reporter testified that Prozeralik was the first Niagara restaurateur who came to mind during a meeting after the incident. *Id.* at 37. The court of appeals determined there was a jury question regarding the actual malice issue because Prozeralik "was one of countless restaurateurs in the region but had no connection

---

[121] ROA.39, 40, 42-44, 48-50, 60, 66-67, 71-73.

[122] ROA.73-74.

[123] ROA.74.

[124] ROA.34; ROA.45.

[125] ROA.72.

[126] ROA.31-32; ROA.37.

whatsoever to the crime, the criminal or the story, except for defendant's employees' rootless speculation and the glaring projection of his name into the public's eye." *Id.* at 39-40.

This case presents a similar situation. Addressing Davis's $4 million commitment, Burnett said, "The head of DHS doesn't make those decisions without the governor's knowledge and approval. That is just unfathomable to me."[127]

Burnett worked as a division director for MDHS in the early 2000s,[128] long before Bryant's tenure as governor,[129] and later founded a nonprofit[130] that relies on MDHS funding. She is well-practiced in offering baseless speculation to receptive journalists. In April 2022, she told Wolfe, "I've been saying all along that all of those TANF subgrants that are suspect – Nancy New, all of them – it was the governor who was the wizard behind the curtain. That's my opinion. The thing about TANF and the governor in Mississippi is: it's a huge pot of money, and the governor has total control over it. The governor just had to have been involved in those decisions."[131]

---

[127] ROA.40.

[128] ROA.173.

[129] ROA.8.

[130] ROA.173.

[131] *Id.*

Burnett does not have firsthand knowledge of what Bryant knew or did, and her experience working in another governor's administration does not render her speculation valuable. A jury could plausibly determine that the defendants' reliance on Burnett's unfounded speculation proves their actual malice.[132]

### b. John Davis

In *Harte-Hanks*, the Sixth Circuit identified eleven factors that "when considered cumulatively… provide[d] clear and convincing evidence of actual malice." 491 U.S. at 689-90. Among these "was evidence that the source of the defamatory publication was biased toward the plaintiff." *Reid v. Viacom International Inc.*, No. 1:14-CV-1252-MHC, 2017 WL 11634619, at *5 (N.D. Ga. Sept. 22, 2017) (citing *Harte-Hanks*, 491 U.S. at 689 n.36). Notably, "[t]here was no evidence that the source's bias against Connaughton sowed doubt about the veracity of the source's information. Nevertheless, the Sixth Circuit found it to be a factor to consider in the actual malice analysis and, by affirming that ruling, the Supreme Court recognized that a jury may have relied on each of those facts." *Id.* (citing *Harte-Hanks*, 491 U.S. at 690).

In this case, Davis's attorney provided his quote to Rosenberg: "I'm embarrassed I succumbed to the powers above me and which had been in place years

---

[132] A jury could likewise determine that Burnett's work history and willingness to offer baseless speculation render her too biased to be believed, further evidencing the defendants' actual malice. *Harte-Hanks*, 491 U.S. at 689 n.36.

before me. That's not an excuse. I deeply regret my actions."[133] Although Davis did not identify the "powers" or explain how he "succumbed" to them, Rosenberg used the statement to imply Bryant's involvement and control. A jury could consider Davis's guilty pleas and the cryptic nature of the quote, and conclude he was too biased to be believed. Accordingly, the defendants' reliance on Davis's quote could plausibly support an actual malice finding.

### 7. The defendants failed to conduct an adequate investigation.

"Where an investigation for a story that is not 'hot news' is grossly inadequate in the circumstances, actual malice may be inferred from the publisher's failings as an investigator." *Bartimo v. Horsemen's Benev. and Protective Ass'n*, 771 F.2d 894, 900 (5th Cir. 1985) (citing *Vandenburg v. Newsweek, Inc.*, 441 F.2d 378, 380 (5th Cir. 1971), citing *Butts*, 388 U.S. at 156-58)). Here, White arrested New, Davis, and several others in February 2020.[134] Davis and New pleaded guilty to state and federal criminal counts in April and September 2022, respectively.[135] MDHS filed suit in

---

[133] ROA.73.

[134] ROA.85.

[135] *Id.*

May 2022[136] and amended its complaint in December 2022.[137] Arena published the Article on May 28, 2023.[138] The welfare fraud scandal was not "hot news."

The Article's sources for its accusations against Bryant are a one-sided interpretation of texts, a speculative quote from Carol Burnett, and a cryptic quote from Davis. Rosenberg could have sought more specific information from Davis;[139] he could have gathered from Burnett reasons why readers should deem her opinion reliable; he could have sought a follow-up interview with White; he could have submitted specific questions to Bryant; he could have requested to interview VanLandingham, Favre, or Poncho James; he could have sought to interview Jacob Black and former MDHS Deputy Executive Director Garrig Shields, whom MDHS alleges are architects of the welfare fraud scheme;[140] he could have sought to interview Freeze; he could have sought to interview current MDHS Executive Director Bob Anderson, the independent auditors who investigated on MDHS's behalf, or MDHS's current counsel to gather their assessments of Bryant's

---

[136] ROA.179.

[137] ROA.192.

[138] ROA.31.

[139] The court can reasonably infer that Davis offered a vague and ambiguous quote because he does not possess specific information that implicates Bryant in wrongdoing. The same inference can be drawn from the fact that state and federal prosecutors have not brought charges against Bryant despite Davis's cooperation following his guilty pleas.

[140] ROA.194.

culpability in the welfare fraud; and he could have sought to interview USM and USM Athletic Foundation officials.[141] There is no indication in the Article that he did any of these things. A jury could plausibly conclude that the defendants intentionally chose not to investigate further to avoid the truth of Bryant's lack of participation in a conspiracy to defraud the state. *Palmtag v. Republican Party of Nebraska*, 999 N.W.2d 573, 710-11 (Neb. 2024); *Harte-Hanks*, 491 U.S. at 692.

### 8. The defendants deliberately distorted facts.

In *Westmoreland v. CBS*, 596 F. Supp. 1170 (S.D. N.Y. 1984), General William Westmoreland sued several defendants for defamation allegedly committed during a television documentary. *Id.* at 1171. Addressing the actual malice issue, the court noted that Westmoreland alleged "dishonest and willful falsity in the editing and presentation of evidence. These contentions concern arguable deliberate misstatements of the evidence supporting the broadcast thesis." *Id.* at 1174. The court denied summary judgment and explained: "Although a reporter may have sufficient evidence of his charge to foreclose any material issue of constitutional malice for its publication, he may nonetheless make himself liable if he knowingly

---

[141] It is apparent that New or individuals close to her provided information to Rosenberg. *See* ROA.31, 32, 37, 51. However, the Article does not attribute a quote to New or suggest that unidentified individuals accused Bryant of wrongdoing. The court can reasonably infer that New either did not accuse Bryant of wrongdoing, or the defendants deemed her accusations too incredible to publish. The same inference can be drawn from the fact that state and federal prosecutors have not brought charges against Bryant despite New's cooperation following her guilty pleas.

or recklessly misstates that evidence to make it seem more convincing or condemnatory than it is." *Id.*; see also, *Schiavone Constr. Co. v. Time, Inc.*, 847 F.2d 1069, 1092 (3rd Cir. 1988); *Crane v. Arizona Republic*, 972 F.2d 1511, 1524 (9th Cir. 1992).

In this case, the Article states that, "Illegal behavior was so institutionalized that some perpetrators showed no fear of getting caught. One of Favre's business partners referred to Bryant as part of his 'team,' to which the governor replied, in part: 'We will get this done,' according to texts *Sports Illustrated* obtained over the course of several months of reporting. The governor texted Favre about 'our cause.'"[142] Later, the Article explains that "[w]hen Favre welcomed Davis, VanLandingham, Teddy [DiBiase] Jr., Nancy New, and Zach New into his home, the governor was not there, but his presence was felt. Before the meeting began, Bryant sent a text to VanLandingham and Favre, referencing an apparent Bryant acquaintance. 'He sounds like someone who can help our cause,' Bryant wrote. 'Let me reach out to him. May need a conference call later.' During the meeting, Nancy New and MCEC agreed to send $1.7 million in [welfare] money to Prevacus. That night, Favre told Bryant: 'Jake would like to follow up with Joe [Canizaro] if possible.' Bryant's reply: 'Sure.'"[143]

---

[142] ROA.34-35.

[143] ROA.49.

In the first passage, the Article implies that Bryant's efforts to help the company navigate regulatory matters and secure private financing were part of an "institutionalized" pattern of "illegal behavior." In the second, the Article juxtaposes Bryant's efforts with New's agreement to illegally divert $1.7 million to the company, implying Bryant's efforts were part of a larger scheme to defraud the state. When this evidence is considered with the Article's repeated claim that Bryant conspired with Davis, New, and Favre,[144] a jury could reasonably determine that Rosenberg attempted to make the evidence appear more convincing or condemnatory than it is. Such a finding would support an actual malice determination.

### 9. The defendants followed a preconceived storyline.

"Evidence that a defendant conceived a storyline in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual malice, and may often prove to be quite powerful evidence." Rodney A. Smolla, 1 Law of Defamation § 3:71, *Actual Malice and the Reporting and Editing Process – Preconceived Story Lines* (2nd ed. May 2025 Update). The seminal issue is whether the publisher had sufficient information at the time of publication to notify him that the accusations at issue might be false. *Palin*, 940 F.3d at 813-815; *Castellani v. Scranton Times, L.P.*, 124 A.3d 1229,

---

[144] ROA.32; ROA.53; ROA.55.

1242-44 (Pa. 2015); *Sisemore v. U.S. News & World Report, Inc.*, 662 F. Supp. 1529, 1535-36 (D. Alaska 1987).

Here, the defendants knew there was an innocent interpretation of Bryant's texts; they knew White had not accused Bryant of misspending welfare funds despite having access to the texts and other evidence; they knew White explained why he had not accused Bryant of wrongdoing in a detailed interview; they knew MDHS hired independent auditors who agreed with White's assessment; they knew that MDHS had not sued Bryant and was currently pursuing claims against others it deemed responsible for the misspending; and they knew that state and federal prosecutors had not pursued charges against Bryant despite possessing Bryant's texts, documentary evidence, and unfettered access to cooperating witnesses who were motivated to implicate Bryant in criminal activities. A jury could plausibly determine that this knowledge put the defendants on notice that their accusations were likely false, and they published their preconceived story anyway.

**10. The defendants refused to retract their accusations.**

In *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir. 1983), *Entrepreneur Magazine* published an article addressing the activities of separate companies operating under the name Golden Bear Distributing Systems, Inc. *Id.* at 946. The article detailed "an investment fraud lawsuit that the California Attorney General had brought against Golden Bear of California, as well

as certain legal difficulties experienced by Golden Bear of Utah. In its description of the company's operations, the magazine also reported that 'Golden Bear's promises were consistent throughout the country,' and gave as an example the sales pitch used by a Golden Bear of Texas marketing director." *Id*. at 947. Golden Bear of Texas successfully sued for defamation, and the magazine's publisher appealed. *Id*.

This Court found that "the juxtaposition of truthful statements about one company with truthful statements about the illegal operations of an independent company of the same name located in a different state" was sufficient evidence of defamation. *Id*. at 948. The Court reasoned that although a literal reader might have realized that the article did not state that law enforcement authorities had investigated Golden Bear of Texas and did not state that it was implicated in the fraud, "we think that an ordinary reader could infer from the article that Golden Bear of Texas engaged in illegal actions much like Golden Bear of California." *Id*. Turning its attention to the issue of actual malice, the Court observed:

> [A]fter the article came out, Golden Bear of Texas contacted *Entrepreneur*, offering to prove that it was innocent of any wrongdoing, and asking that *Entrepreneur* print a retraction. *Entrepreneur* refused. "Under certain circumstances, evidence of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory … might be relevant in showing recklessness at the time the statement was published." Restatement of Torts (Second), § 580A, comment d. at 219 (1977). The record demonstrates that *Entrepreneur* had sufficient time to investigate the activities of Golden Bear of Texas to determine its possible participation in the

investment fraud. We conclude that the evidence supports a jury finding that *Entrepreneur* published the article with reckless disregard of the truth.

*Id.* at 950 (cleaned up); see also, *National Ass'n of Government Employees, Inc. v. National Fed'n of Federal Employees*, 844 F.2d 216, 221 (5th Cir. 1988).

In this case, the Bryants requested that the defendants retract, correct, and apologize for the false and defamatory language in the Article.[145] The defendants failed to respond,[146] despite having ample time to investigate Bryant's possible participation in welfare fraud and access to information that contradicted the Article's theme. A jury could plausibly determine that the defendants' refusal to retract proves their actual malice at the time of publication.

### C. The Bryants should be granted leave to amend their complaint.

This Court has long recognized that "a court ordinarily should not dismiss the complaint except after affording every opportunity to the plaintiff to state a claim upon which relief may be granted." *Deep South Communications, LLC v. Fellegy*, 652 F. Supp. 3d 636, 689 (M.D. La. 2023) (quoting *Byrd v. Bates*, 220 F.2d 480, 482 (5th Cir. 1955)) (cleaned up). This Court has also observed that "[i]n view of the consequences of dismissal on the complaint alone, and the pull to decide cases on the merits rather than on the sufficiency of pleadings, district courts often afford

---

[145] ROA.282-297; ROA.299-306.

[146] ROA.11.

plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal." *Id.* (quoting *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)). The leading treatise on federal practice and procedure advises that "[a] wise judicial practice (and one that is commonly followed) would be to allow at least one amendment regardless of how unpromising the initial pleading appears because except in unusual circumstances it is unlikely that the district court will be able to determine conclusively on the face of a defective pleading whether the plaintiff actually can state a claim for relief." *Id.* (quoting 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3rd ed. 2016)). Consistent with this "wise judicial practice," courts within this circuit have granted plaintiffs leave to amend when they have not requested it, *id.* at 690, and when exhibits improperly presented to the court suggested the plaintiff "may be able to assert plausible claims" in an amended complaint. *MedARC, LLC v. Cigna Behavioral Health of Texas*, No. 3:20-CV-3687-N-BH, 2021 WL 3476810, at *12 (N.D. Tex. July 6, 2021).

In this case, Bryant believed the district court would find his exhibits helpful because they provided alternative interpretations of the texts and other facts supporting his claims. *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 n.6 (5th

Cir. 2019). However, he was mistaken. The court implied that the complaint should have explicitly identified the facts in the SAC that support his actual malice allegations.[147] Given the "wise judicial practice" of allowing amendments, the unique difficulties associated with plausibly pleading actual malice under the federal rules,[148] and the volume of exhibits, the court should have allowed Bryant to file an amended complaint that clearly sets forth the factual basis of his actual malice allegations.

---

[147] ROA.958-959 n.10; ROA.958, 962, 966.

[148] Judy M. Cornett, *Pleading Actual Malice in Defamation Actions after Twiqbal: A Circuit Survey*, 17 Nev. L.J. 709, 727-38 (2017).

## CONCLUSION

Given the facts alleged, this Court should reverse and hold that Bryant plausibly pleaded actual malice. Alternatively, if this Court determines that Bryant should have pleaded the facts supporting his actual malice allegations with greater specificity, it should reverse and allow the Bryants to file an amended complaint.

**RESPECTFULLY SUBMITTED:**

By:    /s/ *William M. Quin II*
William M. Quin II (MS Bar No. 10834)
W. Thomas McCraney, III (MS Bar No. 10171)
**MCCRANEY MONTAGNET QUIN & NOBLE, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:  (601) 707-5725
Facsimile:  (601) 510-2939
Email:        wquin@mmqnlaw.com
                tmccraney@mmqnlaw.com

**Attorneys for Plaintiffs-Appellants, former Mississippi Governor Phil Bryant, and his wife, former First Lady Deborah Bryant**

## CERTIFICATE OF SERVICE

This is to certify that the foregoing instrument has been served on all registered counsel of record on this day via the Court's ECF filing system in compliance with Fed. R. Civ. P. 25(b) and (c), and has been transmitted to the Clerk of Court.

**SO CERTIFIED,** on this 9th day of June, 2025.

/s/ *William M. Quin II*
William M. Quin II

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) as it contains 12,996 words, including footnotes, but excluding the sections exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.1.

2.      The body of the brief meets the typeface requirement of Fed. R. App. P. 32(a)(5) by using a proportionally spaced typeface with serifs and a 14-point font. The footnotes satisfy the typeface requirement of 5th Cir. R. 32.1 as they employ a proportionally spaced typeface and a 12-point font.

3.      This brief meets the typestyle requirement of Fed. R. App. P. 32(a)(6) as it uses a plain, roman style called Times New Roman.

**RESPECTFULLY SUBMITTED,** on this 9th of June, 2025.

/s/ *William M. Quin II*
William M. Quin II (MS Bar No. 10834)
W. Thomas McCraney, III (MS Bar No. 10171)
**MCCRANEY MONTAGNET QUIN & NOBLE, PLLC**
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:  (601) 707-5725
Facsimile:  (601) 510-2939
Email:       wquin@mmqnlaw.com
               tmccraney@mmqnlaw.com

**Attorneys for Plaintiffs-Appellants, former Mississippi Governor Phil Bryant and his wife, former First Lady Deborah Bryant**